UNITED STATES of America,
Appellee,

v.

Robert BANKS, Jaime Gomez, Thomas Marmolejas, Danny Mercedes, Andres Peralta, and Diego Mojica, Defendants,

Johnny Martinez, Defendant–Appellant.

Docket No. 05–0653–CR.

United States Court of Appeals, Second Circuit.

Argued: May 19, 2006.

Decided: Sept. 12, 2006.

ing factors; and that the sentence of over 30 years' imprisonment violated the extradition agreement between the Dominican Republic and the United States. We find that even if the admission of the statements of other defendants violated *Crawford*, the error did not affect Martinez's "substantial rights" and therefore did not amount to "plain error" requiring reversal; the district court did not fail to consider mandatory sentencing factors; and the district court did not abuse its discretion in finding no agreement between the Dominican Republic and the United States limiting Martinez's sentence. Accordingly, we affirm the judgment of conviction.

B. Alan Seidler, New York, NY, for Defendant–Appellant.

Lisa R. Zornberg, Assistant United States Attorney (John M. Hillebrecht, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

Before LEVAL, CALABRESI, and FRIEDMAN,* Circuit Judges.

LEVAL, Circuit Judge.

Johnny Martinez appeals from a judgment of conviction and sentence entered February 3, 2005, in the United States District Court for the Southern District of New York (Chin, *J.*). Martinez argues that receipt in evidence of the guilty pleas and post-arrest statements of other defendants violated his right to confront witnesses pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); that the district court did not take into account required sentenc-

## BACKGROUND

Martinez was tried before a jury on three counts: Count One charged conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958; Count Two, murder for hire, in violation of 18 U.S.C. §§ 2 and 1958; and Count Three, using and carrying firearms during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c). The jury found Martinez guilty of conspiracy to commit murder for hire (Count One) and the firearms violation (Count Three). It found him not guilty of the substantive offense of murder for hire (Count Two). The court sentenced Martinez, principally, to life imprisonment plus ten years.

### A. The Conspiracy

The evidence at trial showed the following. In May 1998, Martinez, Jaime Gomez, and Thomas Marmolejas (collectively, "the gunmen") were recruited by Tony Matos, a member of a heroin-distribution organization ("the organization"), to kidnap

---

* The Honorable Daniel M. Friedman, United States Circuit Judge for the Federal Circuit, sitting by designation.

two members of that organization ("the victims"). This was because the victims were suspected of stealing from the organization. The pay was to be $27,000. The organization, however, soon decided that the victims should be murdered rather than kidnapped. The gunmen accepted a new offer to murder the victims. The pay was to be $10,000 beyond the $27,000 previously offered.

On May 25, 1998, the three hired gunmen, heavily armed, embarked in a van to search for the victims. They were guided by two members of the organization, Robinson Reyes ("Robinson") and Andres Peralta. The gunmen were unable to find the victims that day.

The next day, in the same van, and again guided by Robinson, the gunmen located the victims' car and followed them. When the victims stopped at a traffic light, Martinez and Gomez, armed with a revolver and a machine gun with silencer, approached the car on both sides and shot over 20 bullets through the car's front windows. The victim in the driver's seat, Johan Pena–Perez, was shot dead with 13 gunshot wounds. The passenger, Nilton Duran, escaped and ran into a nearby building while Gomez pursued him on foot, continuing to shoot. He survived but was maimed by gunshot wounds. Police arrived at the scene and arrested Gomez. Robinson and Marmolejas escaped in the van. The organization later paid the gunmen the promised $37,000.

Marmolejas was arrested within a month. He and Gomez were tried and convicted of murder for hire and conspiracy to commit murder for hire. Peralta and Robert Banks, another co-conspirator and organization member, were arrested in October 1999. Peralta pled guilty to murder and conspiracy to murder, while Banks pled guilty to acting as an accessory after the fact to murder. Robinson and Juan Matos Reyes ("Junior"), one of the organization's leaders, pled guilty to murder and conspiracy to murder. Matos pled guilty to intentional killing in connection with a cocaine-distribution conspiracy. Matos and Robinson testified at Martinez's trial.

### B. *The Extradition Request*

Four months after the attack, on September 25, 1998, Martinez was arrested and charged under the present indictment. He was released on bail and fled to the Dominican Republic. Approximately four years later, in August 2002, the United States made a request to the Dominican Republic for Martinez's extradition. He was arrested in the Dominican Republic and, on January 22, 2003, was returned to the United States. One of the disputed issues in this appeal is whether he returned voluntarily, as the Government contends, or pursuant to extradition, as Martinez contends.

### C. *The Crawford Evidence at Trial*

In defending at trial against the charge of conspiracy to murder, Martinez's counsel argued that if any conspiracy was established, it was a conspiracy to *kidnap,* not to murder. In response, the Government supplemented its extensive evidence of the murder objective of the conspiracy with testimony from a case officer that (1) Banks had pled guilty to narcotics charges and to being an accessory to murder after the fact; (2) another organization member, Diego Mojica, had pled guilty to narcotics trafficking; (3) Junior had pled guilty to murder and narcotics charges; and (4) Peralta had told him during a proffer session that Peralta had falsely told Robinson that Martinez was shot during the incident. In addition, the Government introduced Banks's plea allocution, in which Banks admitted giving money to two people involved in a "payback" murder.

Banks, Mojica, Junior, and Peralta did not testify at Martinez's trial. (The evidence did not include the fact that Robinson, Junior, and Peralta had pled guilty to conspiracy to murder.)

In connection with the evidence described above, the prosecutor argued in summation:

[A]sk yourselves if this was really a kidnapping, why on earth would Robinson Reyes, Tony Matos, Andres Peralta, [Junior] Reyes, Robert Banks, why would they all have pled guilty to murder, or in Banks' case accessory after the fact to murder, if this was supposed to be a kidnapping. . . . It simply doesn't make sense. Nobody would voluntarily subject themselves to a life sentence falsely.

The Government concedes that at least some of this evidence was impermissible under the Supreme Court's later decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

### D. *Martinez's Transfer to the United States*

Martinez's counsel, in her opening, said to the jury that Martinez "surrender[ed] to the authorities in the Dominican Republic to return to the United States to face trial." To rebut this suggestion that Martinez had come voluntarily to face the charges, the Government called an agent of the Dominican Republic's National Antidrug Division, who testified that Martinez was "extradited to the United States." On cross-examination, defense counsel asked the agent if he was aware that Martinez had "voluntarily consented" to this extradition.

After the jury had rendered its verdicts, finding Martinez guilty of conspiracy to murder for hire and the firearms violation, the parties returned to the question whether Martinez's return had been compelled or voluntary. On June 8, 2004, a week before the date scheduled for sentence, Martinez submitted a letter, now asserting that he had been extradited from the Dominican Republic pursuant to an agreement limiting his sentence to 30 years. Attached to his letter were certified copies of (1) a statement by the Office of the Attorney General of the Dominican Republic, dated September 10, 2002 (*i.e.*, a few weeks after the United States issued its extradition request), which seemed to suggest that, pursuant to Dominican law, Martinez's sentence could not exceed 30 years; and (2) a "decree" of the President of the Dominican Republic, dated January 14, 2003, also suggesting that Martinez's sentence must be so limited.

The Government responded, submitting three documents. The first was the extradition treaty generally applicable to individuals extradited by the Dominican Republic, which contains no 30–year limitation. The second was a sworn declaration of an official of the United States Department of State, explaining the procedures extraditing nations normally follow when they seek to impose conditions on extradition, noting that no such procedures had been followed in this case, and asserting that the State Department had received no communications from the Dominican Republic regarding limitations on Martinez's sentence. The writer concluded that there was no sentence-limiting agreement between the United States and the Dominican Republic regarding Martinez. The final document was the sworn declaration of the Director of the Office of International Affairs of the Criminal Division of the United States Department of Justice, in which she explained that, to her knowledge, no United States official had received, prior to Martinez's transfer to the United States, any documentation indicating either an extra-

dition-based agreement with the United States on Martinez's sentence or that the Dominican Republic had in fact extradited Martinez. She also noted that such agreements are unusual and, when they occur, they generally follow a certain procedure—which was not followed in this case. Her statement concluded that there was no sentence-limiting agreement regarding Martinez.

### E. *The Sentencing Proceedings*

At the sentencing hearing (which was held, after repeated adjournments, on January 24, 2005), Martinez asserted no objection to the presentence report, but asked that the proceedings be adjourned to permit a hearing to determine whether the Dominican Republic and the United States had entered into a sentence-limiting agreement for his extradition. Martinez asserted that he would encourage an unspecified representative of the Consulate for the Dominican Republic (the "Dominican Consulate") to testify at that evidentiary hearing. He produced no evidence that any official from the Dominican Consulate had expressed a willingness to testify.

The court noted that there were conflicting contentions as to whether Martinez had returned to the United States voluntarily or had been extradited. The court found (1) that there was no sentence-limiting provision in the treaty generally applicable to individuals extradited by the Dominican Republic; (2) that Martinez had failed to demonstrate a supplemental agreement between the two countries that would affect Martinez's sentence; and (3) that Martinez had proffered "nothing . . . in the way of evidence to warrant a hearing." Moreover, Judge Chin noted, although the Dominican Republic had months to make a submission to the court, it had not done so. Judge Chin thus rejected without a hearing Martinez's argu-

ment of a sentence limitation. The court sentenced Martinez primarily to a term of imprisonment of life plus ten years.

As Martinez indicates on appeal, the court did not make specific reference to the various sentencing factors listed at 18 U.S.C. § 3553(a). The judge did review the presentencing report and invited objections, accepted the facts as set forth the presentence report, and heard defense counsel's discussion of the defendant's age, health, drug-use history, and criminal history. He also acknowledged that the Sentencing Guidelines called for a life sentence, but indicated that it was "discretionary." Martinez, for his part, has not challenged the Guidelines calculation itself, either below or on appeal.

The Government notes in its argument to this court that at no time in the period following his sentencing has the Dominican Republic "protested Martinez's sentence or otherwise sought to appear in this action." Martinez has in turn submitted to this court one document that he did not provide to the district court: a letter from the Dominican Consulate to Martinez's counsel, dated one month after the imposition of sentence, suggesting that sentencing a Dominican citizen to "a term exceeding 30 years . . . violate[s] the sustaining law on extradition matters" and that the Consulate would forward Martinez's complaint to the Dominican Secretariat of State of Foreign Affairs.

### DISCUSSION

### A. *The* Crawford *Violations*

Martinez contends his Sixth Amendment right to confront witnesses against him was violated by the receipt in evidence of Banks's plea allocution and of the case officer's testimony regarding the guilty pleas of Banks, Mojica, and Junior and Peralta's proffer session. Martinez relies

on law established by the Supreme Court subsequent to his trial.

Effecting a significant change in Sixth Amendment jurisprudence, the Supreme Court ruled in 2004 that in criminal prosecutions, unless a declarant is unavailable and the defendant had a prior opportunity to cross-examine him, the Confrontation Clause forbids use against the defendant of the declarant's out-of-court testimonial statements admitted for their truth. *See Crawford v. Washington,* 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Government does not dispute that the pleas, allocutions, and post-arrest statement made at a proffer session constitute "testimonial statements" of the sort barred by *Crawford.* We assume without deciding that this characterization is correct. *Cf. United States v. McClain,* 377 F.3d 219, 222 (2d Cir.2004) (holding that a plea allocution is a testimonial statement); *see also Crawford v. Washington,* 541 U.S. at 68, 124 S.Ct. 1354 (declining to "spell out a comprehensive definition of 'testimonial' "); *id.* at 51–52, 124 S.Ct. 1354 (providing "[v]arious formulations of . . . 'testimonial' statements").

Martinez contends his conviction must be overturned by reason of the *Crawford* violations unless the Government proves beyond a reasonable doubt that the errors did not contribute to the jury's verdict. That, however, is not the standard applicable in Martinez's case, because it applies only when the claim of error has been preserved below. *See, e.g., United States v. Casamento,* 887 F.2d 1141, 1179 (2d Cir.1989). Martinez made no objection in the district court to this evidence based on the Confrontation Clause.

Rather, our review is under one of two alternative "plain error" standards. Under the classic plain error standard, the court may overturn a conviction on the basis of a forfeited error only where the defendant shows an error that (1) was "plain," (2) "affect[ed] substantial rights," and (3) "seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings.' " *United States v. Nucci,* 364 F.3d 419, 421 (2d Cir.2004) (internal quotation marks omitted). In *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Supreme Court elaborated that reversal for plain error should "be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.* at 163 n. 14, 102 S.Ct. 1584. Alternatively, we have employed the "modified plain error" standard, when " 'the source of plain error [has been] a supervening decision.' " *United States v. Outen,* 286 F.3d 622, 639 (2d Cir.2002) (quoting *United States v. Monteleone,* 257 F.3d 210, 223 (2d Cir. 2001)). This standard requires "the government, not the defendant, [to bear] the burden [of] demonstrat[ing] that the error did not affect substantial rights." *Outen,* 286 F.3d at 639. We need not resolve which is the appropriate the standard because we find that, under either standard, Martinez is not entitled to have his conviction overturned.[1]

The Government's lawful evidence so powerfully established that the objective of the conspiracy was to murder, not to kidnap, that the *Crawford* evidence cannot be said to have affected Martinez's substantial rights or impaired the fairness or integrity of the proceedings (or the public perception thereof). Robinson, the co-conspirator who rode in the van with

---

**1.** We do not address the Government's argument that the Supreme Court's decision in *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), requires that this court rely upon the plain error standard rather than modified plain error.

the gunmen, testified—repeatedly and without equivocation or contradiction—that he had no doubt that the relevant conspiracy was to murder, not to kidnap. He testified that Junior had explained to him that the victims' "betrayal had to be paid in blood," and that Martinez had explicitly asked before the attack whether they "should grab one of [the victims] and shoot the other one." Robinson's description of the attack further confirmed the nature of the intention. He testified that Martinez and the other gunmen approached the victims' car from behind on either side when it was stopped at a red light and shot many rounds through the front windows, a procedure obviously designed to kill and incompatible with intent to kidnap. This description was supported by the statement of Duran, the surviving victim, that after the van pulled up near his car, "someone from the van began shooting at him and Johan" (the other victim). Furthermore, forensic evidence describing the condition of the scene and of the victims' car was consistent with these descriptions.

Matos likewise testified that the conspiracy was to murder, not to kidnap. He testified that Martinez himself had said the conspiracy, which began as a kidnaping plot, had become a murder plot; that Martinez told him extra money had been paid for the murder; and that one of the participants had described the deliberate way in which the gunmen had approached the victims' car and fired.

Proof of the conspiracy to murder, as opposed to a conspiracy to kidnap, was solidly established. There was no evidence to the contrary. Whatever corroboration was provided by the *Crawford* evidence was not of sufficient importance to meet the standards for plain error. It is true that "[e]rror going to the heart of a critical issue is less likely to be harmless." *United States v. Forrester,* 60 F.3d 52, 64–65 (2d Cir.1995) (internal quotation marks omitted). The *Crawford* evidence, nonetheless, was cumulative and added relatively little to the powerful proper evidence of conspiracy to murder. The receipt of this evidence did not produce a "miscarriage of justice." *Frady,* 456 U.S. at 163 n. 14, 102 S.Ct. 1584.

### B. *The Reasonableness of the Sentence Under* Crosby

Martinez cannot prevail on his claim under *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005). Martinez contends that the sentence imposed was unreasonable because the district court failed to "undertake an analysis of the sentencing factors stated in [18 U.S.C. § 3553(a)], and state how those factors applied ... to [his] case." The sole basis for his contention is that the district court failed to discuss sentencing factors dictated by 18 U.S.C. § 3553(a). It is true that the statute requires a court imposing a sentence to "consider" certain factors. *United States v. Fleming,* 397 F.3d 95, 100 (2d Cir.2005). However, there is no requirement that the court mention the required factors, much less explain how each factor affected the court's decision. In the absence of contrary indications, courts are generally presumed to know the laws that govern their decisions and to have followed them. Nothing in the record suggests that Judge Chin was ignorant of, misunderstood, or failed to consider any aspect of the required considerations. We reject the defendant's contention.[2]

**2.** The Government contends, citing *United States v. Colon,* 884 F.2d 1550 (2d Cir.1989), that Martinez may not on appeal challenge as unreasonable a discretionarily imposed sentence that falls within the Guidelines range. The Government's contention has recently

## C. The Transfer of Martinez to the United States

■ Finally, Martinez contends that his sentence of life imprisonment plus ten years was imposed in violation of an agreement between the United States and the Dominican Republic in connection with his extradition that he would not receive a sentence of imprisonment in excess of 30 years. He contends that the Dominican Republic conditioned his extradition on the promise of the United States to limit any sentence Martinez might receive to 30 years imprisonment. As a consequence, Martinez argues, the sentence that he received was illegal.[3] The district court rejected this challenge on the basis of its factual finding that Martinez's return to the United States was not conditioned on any agreement between the two countries so limiting his sentence. Martinez challenges this finding and, in addition, contends that the district court abused its discretion in making the finding without first holding an evidentiary hearing.

As a preliminary matter, the Government contends that if the United States contracted to limit the duration of Martinez's sentence, the right to enforce the agreement belongs to the Dominican Republic and not to Martinez. Different courts in this circuit have viewed the issue differently. *See, e.g., United States v. Martonak*, 187 F.Supp.2d 117, 121 (S.D.N.Y.2002); *United States v. Nosov*, 153 F.Supp.2d 477, 480 (S.D.N.Y.2001). This court has not ruled on the question.

We need not resolve this question. We affirm because we find no error in the district court's findings or proceedings. In the first place, the extradition treaty between the United States and the Dominican Republic contains no provision so limiting sentences. Secondly, although the Dominican Republic apparently has a law providing for such a limitation when it extradites its citizens to other countries, Martinez failed to submit any document showing that the Dominican Republic invoked the law in its dealings with the United States in connection with Martinez's extradition.

The Government's papers in response further confirmed that the United States received no communication from the Dominican Republic seeking agreement limiting his sentence, and that none of the procedures conventionally followed by extraditing nations in seeking such agreements were followed by the Dominican Republic. Martinez submitted nothing to rebut the Government's showing. In short, the most that was shown by Martinez's submissions was that officials of the Dominican Republic believed, no doubt

been rejected by this court. *See United States v. Kane*, 452 F.3d 140, 144 (2d Cir.2006). In any event, as explained above, Martinez's argument fails on its merits.

3. Martinez also raises a new issue on appeal, arguing that Article 6 of the Vienna Treaty Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (the "Vienna Treaty"), 28 I.L.M. 493 (1989), limits the sentence that a United States court can impose on an extradited defendant. By its express terms, however, Article 6 of the Vienna Treaty applies only to individuals extradited for narcotics offenses. *See id.* at 507 (1989). Martinez was transferred to United States custody based on murder, conspiracy to commit murder, and weapons charges. The Vienna Treaty is thus inapplicable in his case.

Martinez similarly raises a claim based on the Vienna Convention on Consular Relations, which requires that the United States promptly notify the consulate of a foreign national's arrest or detention. *See* 21 U.S.T. 77; 28 C.F.R. § 50.5(a)(1). It is undisputed, however, that the Dominican Republic arrested Martinez before transferring him to United States custody. Martinez, therefore, cannot reasonably contend that the Dominican Republic was not aware of his arrest and detention.

based on the domestic law of the Dominican Republic, that Martinez's sentence would be so limited. None of the submissions by Dominican officials, however, pointed to any agreement or undertaking made by the United States to limit his sentence or even to a communication from the Dominican Republic to the United States expressing an expectation that the sentence would be so limited.

Martinez's legal argument is necessarily predicated on the existence of an undertaking by the United States vis-a-vis the Dominican Republic that his sentence would not exceed 30 years. The statutes of the Dominican Republic would not, of their own force, bind the United States. *Cf. Rosado v. Civiletti,* 621 F.2d 1179, 1192 (2d Cir.1980) ("[N]o nation may unilaterally bind another sovereign by the sheer force of its statutory enactments....."). Although he had over six months between the jury's finding of guilt and the actual sentencing proceeding, Martinez failed to produce any evidence that the United States ever entered into an agreement or undertaking to limit the duration of his sentence. Furthermore, while Martinez requested an evidentiary hearing, he produced no indication what witnesses he would call or what evidence he would adduce beyond the inadequate contents of his written submissions.[4]

"The decision to hold an evidentiary hearing during sentencing ... remains in the sound discretion of the district court." *United States v. Cotto,* 347 F.3d 441, 448 n. 7 (2d Cir.2003); *see also United States v. Zagari,* 111 F.3d 307, 330 (2d Cir.1997) (noting that such discretion is "broad"). Under the circumstances presented in this case—including the length of time between conviction and sentencing; the lack of evi-

dence establishing an agreement or undertaking on the part of the United States vis-a-vis the Dominican Republic; and Martinez's failure to identify what, if any, evidence he might have submitted at a future hearing to challenge the conclusion that no such agreement was reached—we find that the district court neither abused its discretion nor erred in rejecting Martinez's claim without conducting a hearing.

## CONCLUSION

For the foregoing reasons, the judgment of conviction is affirmed.

---

4. Martinez's counsel did say he would seek to obtain a witness from the Dominican Consulate. Counsel, however, neither identified the witness nor stated that such a witness had indicated willingness to testify, nor specified what evidence the witness would give.